IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN H. FREEMAN, | ) | CASE NO. 1:12CV2349 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY,[1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Kevin H. Freeman ("Plaintiff" or "Freeman") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act), 42 U.S.C. §§ 416(i) and 423. Doc. 1. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the following reasons, the final decision of the Commissioner should be **AFFIRMED.**

## I. Procedural History

Freeman filed an application for DIB on March 23, 2010, alleging a disability onset date of July 2, 2003. Tr. 137-43. He claimed that he was disabled due to back problems and rotator cuff injuries. Tr. 174. Freeman's application was denied initially and on reconsideration. Tr. 115-17, 121-27. At Freeman's request, on August 9, 2011, a hearing was held before Administrative Law Judge C. Howard Prinsloo (the "ALJ"). Tr. 30-62. On August 26, 2011, the

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is hereby substituted for Michael J. Astrue as the Defendant in this case.

1

ALJ issued a decision finding that Freeman was not disabled.[2]  Tr. 15-29.  Freeman requested review of the ALJ's decision by the Appeals Council on September 22, 2011.  Tr. 12-13.  On July 21, 2012, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II.  Evidence

### A.  Background

Freeman was born on March 27, 1960, and was 49 years old on the date last insured.  Tr. 24, 137.  He has a high school diploma.  Tr. 36, 603.  His past relevant work experience includes work as an auto technician.  Tr. 36, 176.

### B.  Medical Evidence

#### 1.  Treatment History

Freeman has a history of low back pain dating back to a work-related injury in 2000.  Tr. 227.  Freeman filed a claim with the Ohio Bureau of Worker's Compensation ("BWC") for this injury.  Tr. 341.  Freeman sought treatment for his back injury at Beachwood Orthopedic & Physical Medicine under the care of Jonathan Waldbaum, M.D.

At an appointment with Dr. Waldbaum on January 15, 2003, Freeman reported that his low back pain had worsened with some radicular pain into the right lower extremity.  Tr. 328.  He stated that the pain became worse with increased work activities.  Tr. 328.  Dr. Waldbaum noted that Freeman was able to continue his work duties.  Tr. 328.  Freeman requested epidural injections in his lower back, which had previously helped with the pain.  Tr. 328.  Dr. Waldbaum diagnosed lumbar spine sprain with extension of symptoms into the right lower limb, symptomatic aggravation of lumbar spinal stenosis, and symptomatic aggravation of lumbar

---

[2] In this case, Freeman alleged that he became disabled on July 2, 2003, and his insured status expired on March 31, 2009.  Tr. 170, 203, 211.  Therefore, Freeman's burden was to establish that he was disabled during the period of July 2, 2003 to March 31, 2009.

degenerative disc disease.  Tr. 328.  Dr. Waldbaum continued Freeman's prescriptions for Vicodin and Naprosyn and found that Freeman could perform medium-duty work.  Tr. 328.

At a follow-up appointment with Dr. Waldbaum on June 11, 2003, Freeman reported that there were some days when his low back pain was minimal and other days when the pain was more severe.  Tr. 327.  Freeman stated that he wanted to explore more aggressive treatment options for his back pain, such as cortisone injections.  Tr. 327.  Dr. Waldbaum continued Freeman's medications and medium-duty work restrictions.  Tr. 326.  At an appointment on November 24, 2003, Freeman reported continued pain in his low back.  Tr. 325.  He stated that any activity aggravated his pain.  Tr. 325.  Dr. Waldbaum again continued Freeman's medications and medium-duty work restrictions.  Tr. 324.

In January 2004, Freeman suffered a shoulder injury while at work and filed an additional claim for this injury with the BWC.  As with his back injury, Freeman sought treatment for his shoulder injury at Beachwood Orthopedic & Physical Medicine.  On January 21, 2004, Freeman saw Edward Gabelman, M.D., for evaluation of his shoulder injury.  Tr. 323.  Dr. Gabelman diagnosed a left shoulder sprain and, based on this injury, found that Freeman was unable to perform the duties of his job from January 7, 2004, to March 1, 2004.  Tr. 323.  Dr. Gabelman requested permission from the BWC for an MRI of the left shoulder and for rehabilitative therapy for the shoulder injury.  Tr. 323.

On February 19, 2004, Freeman saw Dr. Waldbaum for his back injury and reported increased low back pain.  Tr. 322.  Dr. Waldbaum continued Freeman's medications and requested permission from the BWC for approval of epidural corticosteroid spine block injections.  Tr. 322.  At a follow-up appointment with Dr. Waldbaum on June 23, 2004, Freeman reported some improvement with his back pain and that physical therapy was helpful in

3

controlling his pain. Tr. 319. Freeman declined epidural injections because he wanted to continue with physical therapy. Tr. 319. Freeman stated that the pain had improved to the point where he did not anticipate needing any further epidural injections. Tr. 319. He also stated that he no longer required the use of medication regularly. Tr. 319. Dr. Waldbaum continued Freeman's medications. Tr. 319.

On July 2, 2004, Freeman saw Dr. Gabelman for his shoulder injury and complained of continued pain. Tr. 318. Dr. Gabelman noted that medication had been helpful without any ill effects. Tr. 318. He extended Freeman's return-to-work date to September 1, 2004. Tr. 318.

Freeman saw Dr. Waldbaum on September 22, 2004, and reported a worsening of his low back pain. Tr. 317. He stated that activities make the pain worse. Tr. 317. Dr. Waldbaum noted that Freeman remained off work at that time due to his unrelated shoulder injury. Tr. 317.

Freeman saw Dr. Gabelman for his shoulder injury on October 15, 2004. Tr. 316. He reported continued pain, weakness, and restricted motion in the left shoulder. Tr. 316. Dr. Gabelman noted that Freeman could not lift or reach over his head due to his shoulder injury. Tr. 316. He extended Freeman's return-to-work date to February 1, 2005. Tr. 316.

An MRI of the lumbar spine performed on October 25, 2004, revealed degenerative disc disease, mild spondylosis, mild foraminal stenosis, annular bulging, and disc herniation at L5-S1. Tr. 238. At an appointment with Dr. Waldbaum on November 24, 2004, Freeman reported increased low back pain and stated that prolonged standing, bending, twisting, and lifting aggravated his pain. Tr. 314. Dr. Waldbaum continued Freeman's physical therapy. Tr. 314.

An MRI of Freeman's left shoulder was performed on November 23, 2004, which revealed that Freeman had some narrowing of his AC joint and a full-thickness crescent right tear of his supraspinatus tendon complex. Tr. 234.

4

Freeman had a follow-up appointment with Dr. Gabelman on December 2, 2004, and complained of pain, weakness, and restricted motion in the left shoulder. Tr. 313. Dr. Gabelman prescribed Vicodin and recommended physical therapy for Freeman's shoulder to improve his motion and strength. Tr. 313. At a follow-up appointment on December 23, 2004, Freeman reported that physical therapy had helped his shoulder and that his shoulder was somewhat better. Tr. 312. Dr. Gabelman extended Freeman's return-to-work date to March 1, 2005. Tr. 312. At a follow-up appointment with Dr. Gabelman on February 9, 2005, Freeman stated that physical therapy on his shoulder had been very helpful. Tr. 310. He stated that he had no pain with shoulder motion when elevating the shoulder. Tr. 310. On exam, Dr. Gabelman noted full passive motion in the left shoulder with no tenderness but indicated that Freeman experienced pain when lowering the shoulder from an arc of approximately 120-90 degrees. Tr. 310.

Freeman saw Dr. Waldbaum on March 7, 2005, for his back injury. Tr. 309. Freeman reported that he had significant improvement with regard to his back symptomatology with epidural injections. Tr. 309. Dr. Waldbaum continued Freeman's medications. Tr. 309.

On March 23, 2005, Freeman saw Dr. Gabelman for his shoulder injury and reported that his left shoulder was better. Tr. 307-08. On exam, the shoulder was stable and there was no tenderness around the joint. Tr. 308. Dr. Gabelman extended Freeman's return-to-work date to May 1, 2005. Tr. 307.

On May 4, 2005, Freeman had a follow-up appointment with Dr. Waldbaum after undergoing an epidural injection to his lower back. Tr. 307. Freeman reported that his back was doing very well and that he was only having minimal pain at that time. Tr. 307. He also stated that he was very happy with the results of the injection. Tr. 307.

5

On April 20, 2005, Freeman saw Dr. Gabelman for his shoulder injury and reported episodic pain in his shoulder.  Tr. 306.  Dr. Gabelman noted that medication had been helpful.  Tr. 306.  He continued Freeman's medications and extended his return-to-work date to July 1, 2005.  Tr. 306.  Freeman had a follow-up appointment with Dr. Gabelman on July 25, 2005.  Tr. 305.  Dr. Gabelman found that, even though Freeman still had some discomfort in the left shoulder, he could return to light-duty work.  Tr. 305.  Specifically, Dr. Gabelman found that Freeman "could do work without using the left upper extremity above shoulder level and lifting no more than 20 pounds on an intermittent basis with the left shoulder."  Tr. 305.  However, because Freeman's employer did not offer any light-duty work, Dr. Gabelman extended his return-to-work date to October 1, 2005.  Tr. 305.  Freeman saw Dr. Gabelman on September 9, 2005 and complained of pain at extremes of motion in the left shoulder, especially above shoulder level.  Tr. 301.  Dr. Gabelman extended Freeman's return-to-work date to December 1, 2005.  Tr. 300.

Freeman underwent another MRI of the lumbar spine on September 15, 2005.  Tr. 228-229.  The MRI revealed only a slight increase in central disc protrusion since Freeman's previous MRI in October 2004, as well as signs of an annular tear.  Tr. 228.

On December 20, 2005, Freeman saw Dr. Gabelman and reported pain in his left shoulder.  Tr. 290.  He stated that he did not experience pain when he elevated the shoulder but did experience pain when he lowered the shoulder.  Tr. 290.  Dr. Gabelman extended Freeman's return-to-work date to April 1, 2006.  Tr. 290.

Freeman continued to experience low back pain and continued to treat at Beachwood Orthopedic & Physical Medicine throughout 2006.  Tr. 282-88, 396-470.  Freeman also continued to have left shoulder problems in 2006.  He saw Dr. Gabelman on February 21, 2006,

6

and complained of increased pain in the left shoulder.  Tr. 287.  Dr. Gabelman noted that Freeman had considerable pain and restricted motion in the left shoulder.  Tr. 287.  He discussed surgical intervention with Freeman and referred him to an orthopedic surgeon.  Tr. 287.

An MRI of Freeman's left shoulder was taken on March 18, 2006.  Tr. 278.  It showed degenerative changes of the AC joint, long head biceps and subscapularis tendinopathy, and confirmed a full-thickness distal supraspinatus tendon tear.  Tr. 278.

On May 1, 2006, Freeman presented to J. Michael Vento, M.D., an orthopedic surgeon, for a surgical consultation regarding his left shoulder injury.  Tr. 371.  X-rays taken by Dr. Vento showed a Type II acromion.  Tr. 371.  Dr. Vento concluded that Freeman would need surgical repair of his rotator cuff.  Tr. 371.  On June 1, 2006, Freeman underwent a left shoulder arthroscopy and rotator cuff repair.  Tr. 373-74.

On June 12, 2006, Freeman saw Dr. Gabelman and stated that his shoulder pain had improved since the surgery.  Tr. 400.  Dr. Gabelman extended Freeman's return-to-work date to August 1, 2006.  Tr. 400.  At an appointment with Dr. Gabelman on July 20, 2006, Freeman reported that his shoulder pain had improved and that, with physical therapy, it was getting better every day.  Tr. 413.  Dr. Gabelman extended Freeman's return-to-work date to September 1, 2006.  Tr. 413.  At an appointment on August 4, 2006, Dr. Gabelman noted that Freeman's pain continued to improve after the surgery and extended his return-to-work date to October 1, 2006.  Tr. 421.  Freeman saw Dr. Gabelman for a follow-up appointment on September 28, 2006, and reported increased pain in his left shoulder.  Tr. 448.  Freeman stated that his pain was aggravated by above shoulder activity, lying on the affected side, putting his hand behind his back, weather changes, pushing and pulling, and coughing.  Tr. 448.  Dr. Gabelman extended his return-to-work date to December 1, 2006.  Tr. 448.

Freeman saw Dr. Gabelman on October 19, 2006, for his left shoulder injury. Tr. 455-56. Dr. Gabelman noted that his left shoulder had improved. Tr. 455. Although he extended Freeman's return-to-work date to December 1, 2006, he opined that Freeman was able to return to light-duty work with no above shoulder work. Tr. 456. Freeman saw Dr. Gabelman again on November 2, 2006, and reported that the pain in his left shoulder had improved. Tr. 460. Dr. Gabelman reiterated that Freeman could return to light-duty work as long as he did not work above shoulder level. Tr. 461. At an appointment on December 21, 2006, Dr. Gabelman specifically found that Freeman was able to return to light-duty work but noted that his employer did not offer any light-duty work. Tr. 468.

Dr. Gabelman continued to treat Freeman in 2007 for his shoulder injury and repeatedly stated that Freeman could return to light-duty work with no working above shoulder level. Tr. 477, 498, 506, 511. Freeman also continued treatment at Beachwood Orthopedic & Physical Medicine in 2007 for his low back pain. Tr. 470-528. The records from Beachwood Orthopedic & Physical Medicine end at August 13, 2007, and there are no additional medical records in the file concerning treatment of Freeman's low back pain or left shoulder injury during the relevant time period.

### 2. State Agency Reviewing Physician

On April 21, 2010, Leigh Thomas, M.D., a state agency physician, reviewed the medical record and completed a Physical Residual Functional Capacity assessment. Tr. 534-41. She opined that Freeman could perform light work, i.e., could lift and/or carry 20 pounds occasionally and 10 pounds frequently and could stand/walk or sit for 6 hours in an 8-hour workday, with occasional stooping, occasional kneeling, occasional crouching, occasional crawling, and no ladders/ropes/scaffolds. Tr. 353-36. Dr. Thomas also opined that Freeman was

limited to occasional overhead reaching, occasional left arm controls/levers, and occasional handling and fingering on the left side. Tr. 537.

## C. Administrative Hearing

### 1. Freeman's Testimony

On August 9, 2011, Freeman appeared with counsel and testified at the administrative hearing before the ALJ. Tr. 32-57. Freeman testified that he injured his back in 2001 but continued to work until July of 2003. Tr. 36-37. He stated that he finally had to stop working because the pain had become unbearable. Tr. 37. Freeman explained that the degree of his pain varies depending on the day. Tr. 40-41. Freeman stated that the only thing that has helped alleviate his pain is medication. Tr. 41. He testified that he takes Vicodin and Oxycodone for his pain but that the pain never fully goes away. Tr. 41. Freeman stated that he also had epidural injections to help treat the pain. Tr. 44.

Freeman also testified that he would not be able to stand for long periods of time because of his back pain and that he would have to sit down and change his position from standing to sitting to stop the pain. Tr. 37-38. Freeman also explained that his hands and arms would go numb. Tr. 38-39. In addition, Freeman stated that he could only walk a block before he would need a break. Tr. 42. He also said he could only sit for approximately 15 minutes before needing to shift positions. Tr. 42. Freeman explained that he had trouble lifting and reaching because of pain in his left shoulder. Tr. 43. He testified that he cannot do yard work any more because of his back and shoulder pain. Tr. 43. He also stated that he has difficulty cooking because of his limited ability to use his left hand. Tr. 44.

### 2. Vocational Expert's Testimony

Mary Harris (the "VE") appeared at the hearing and testified as a vocational expert. Tr. 58-61. She stated that Freeman had previously worked as a service station mechanic (skilled position at the medium exertional level). Tr. 58. The ALJ asked the VE whether a hypothetical individual with Freeman's vocational characteristics and the following limitations could perform Freeman's past work or any other work in the national economy:

> This individual retains the residual functional capacity for light work, but is limited to no more than occasional pushing or pulling, or reaching over shoulder level with the left upper extremity.

Tr. 58-59. The VE testified that the hypothetical individual could not perform Freeman's past relevant work but could perform other jobs that existed in significant numbers in the national economy, including hand packager (300,000 jobs nationally and 24,000 jobs in Ohio); electronics worker (215,000 jobs nationally and 7,000 jobs in Ohio); and small products assembly (280,000 jobs nationally and 17,000 jobs in Ohio). Tr. 59. In a second hypothetical, the ALJ added a limitation that the individual would need to work in environments where he would avoid concentrated exposure to respiratory irritants. Tr. 59. The VE testified that the additional limitation would not affect the number of jobs she had previously cited. Tr. 59. Finally, in a third hypothetical, the ALJ added the limitation that the individual would be unable to engage in sustained work activity for a full eight-hour day on a regular and consistent basis. Tr. 59-60. The VE responded that, with the additional limitation, there would be no jobs that the hypothetical individual could perform. Tr. 60.

Counsel for Freeman was provided with an opportunity to cross-examine the VE. Tr. 60. Counsel asked the VE to consider the second hypothetical asked by the ALJ but further assume the following additional limitations: that the individual would need a sit/stand option at will

10

because of low back pain, that the individual would be limited to only occasional reaching forward with the left shoulder, and that the person's ability to handle and feel on the left side would be limited to only occasional. Tr. 60. The VE testified that the individual would not be able to perform any work under that hypothetical. Tr. 60. The VE explained that most unskilled jobs, especially at the sedentary level, would require bilateral handling. Tr. 60.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2). In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if

>
> claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

The ALJ found that Freeman met the insured status requirements of the Act through March 31, 2009. Tr. 20. At Step One of the sequential analysis, the ALJ determined that Freeman had not engaged in substantial gainful activity during the period from his alleged onset date of July 2, 2003, through his date last insured of March 31, 2009. Tr. 20. At Step Two, he found that Freeman had the following severe impairments: degenerative disc disease, degenerative joint disease of the left shoulder status post surgical repair, and hepatitis C. Tr. 20-21. At Step Three, the ALJ found that Freeman did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[3] Tr. 19-20. The ALJ then determined Freeman's RFC and found that he could perform a range of light work except that he can engage "in no more than occasional

---

[3] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

pushing/pulling or reaching over shoulder level with his left upper extremity." Tr. 21-24. At Step Four, the ALJ found that Freeman was unable to perform any past relevant work. Tr. 24. At Step Five, after considering his vocational factors, RFC, and the evidence from the VE, the ALJ found that Freeman was capable of performing other jobs that existed in significant numbers in the national economy. Tr. 25-26. The ALJ concluded that Freeman was not disabled. Tr. 26.

## V. Arguments of the Parties

Freeman objects to the ALJ's decision on two grounds. First, Freeman contends that the ALJ erred because, although he assigned significant weight to the opinion of Dr. Leigh Thomas, the state agency reviewing physician, he failed to include in his RFC determination all of the restrictions set forth by Dr. Thomas. Second, Freeman argues that the ALJ erred at Step Five of the sequential analysis because he relied on testimony from the VE that was in response to an incomplete hypothetical.

In response, the Commissioner argues that the ALJ properly evaluated the opinion of Dr. Thomas. The Commissioner also asserts that the ALJ reasonably relied on the VE's testimony to find that Freeman could perform jobs that exist in significant numbers in the national economy.

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B. The ALJ Properly Evaluated the Opinion of Dr. Thomas

Freeman argues that the ALJ erred because he accorded significant weight to the opinion of state agency reviewing physician Dr. Leigh Thomas but did not include in his RFC determination all of the restrictions found by Dr. Thomas. Specifically, Freeman argues that the ALJ erred by failing to include Dr. Thomas' restriction of only occasional handling and fingering on the left side. Doc. 15, pp. 8-10. This argument is without merit.

Federal regulations establish the hierarchy of medical opinion evidence. At the top of the hierarchy are opinions provided by the claimant's treating source. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c) (2), 416.927(c)(2). Opinions from these sources are entitled to controlling weight so long as the opinion is well supported by acceptable medical evidence and not inconsistent with the other substantial evidence of record. *Wilson*, 378 F.3d at 544. Next in the hierarchy are opinions issued by examining physicians. 20 C.F.R. §§ 404.1527(c), 416.927(c). Opinions from medical professionals who have only examined the claimant on one occasion are not automatically entitled to any special degree of deference. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994).

Finally, the adjudicator must consider the findings of non-examining physicians. 20 C.F.R. §§ 404.1527(e), 416.927(e). Opinions from non-examining physicians are not entitled to any special degree of deference. *Id.* However, the regulations recognize that opinions from non-examining state agency consultants may be entitled to significant weight, as these individuals are "highly qualified" and are "experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2) (i); *see Barker*, 40 F.3d at 794.

Here, Dr. Thomas was not a treating physician and Dr. Thomas's opinion was not entitled to any special deference. As such, the ALJ was not required to adopt Dr. Thomas' opinion wholesale and include every restriction assessed by Dr. Thomas in the RFC determination. *See, e.g., Marmol v. Comm'r of Soc. Sec.,* No. 1:12CV1930, 2013 WL 1150076, *8 (N.D. Ohio March 19, 2013) (holding that, although the ALJ considered the findings and conclusions of the state agency consulting examiner, the ALJ was not required to adopt her entire opinion and include every restriction); *Lambert-Newsome v. Astrue*, 2012 WL 2922717, at *6 (S.D. Ill. July 17, 2012) (noting the fact that ALJ gave great weight to an opinion "does not mean he was required to adopt it wholesale."); *Irvin v. Astrue*, 2012 WL 870845, at *2-3 (C.D. Cal. March 14, 2012) (finding that, although ALJ gave great weight to a medical source opinion, he did not err in implicitly rejecting one limitation found in that opinion). Thus, the ALJ's failure to adopt all of the restrictions set forth by Dr. Thomas does not, by itself, constitute reversible error.

Moreover, substantial evidence supports the ALJ's implicit rejection of Dr. Thomas' restriction that Freeman was limited to only occasional handling and fingering on the left side. Not one of Freeman's treating physicians ever noted that Freeman had any limitations with respect to handling and fingering on the left side. To the contrary, in 2005, Dr. Gabelman opined that Freeman could perform light work as long as he did not use his left upper extremity above

the shoulder level and lifted no more than 20 pounds on an intermittent basis with the left shoulder. Tr. 305. And, in 2006, after Freeman's surgery to repair his torn rotator cuff, Dr. Gabelman found that he could perform light work as long as he did not work above shoulder level. Tr. 456, 461, 465, 467-68, 477, 506, 511. At no time did any of his treating physicians place any restrictions or limit Freeman with regard to handling and fingering on the left side. There is no other evidence in the record to support such a restriction. Accordingly, the ALJ did not err by failing to adopt Dr. Thomas' restriction of only occasional handling and fingering on the left side.

C.     **The ALJ Did Not Err at Step Five of the Sequential Analysis**

Freeman also argues that the ALJ erred at Step Five because he relied on testimony of the VE that was in response to an incomplete hypothetical. In particular, Freeman contends that the ALJ's hypothetical to the VE did not accurately portray his limitations and should have included a limitation to only occasional handling and fingering on the left side as set forth by Dr. Thomas. Doc. 15, pp. 9-10. Freeman argues that, had such a restriction been included in the hypothetical, the jobs identified by the VE would have been excluded because they require frequent handling and fingering. He therefore argues that the VE's testimony does not constitute substantial evidence. This argument is also lacking in merit.

Once it has been determined that a claimant cannot perform his past relevant work, the burden shifts to the Commissioner at Step Five to show that there are other jobs that exist in significant numbers in the economy that the claimant can perform, consistent with his or her RFC and vocational factors of age, education and work experience. *Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987). In reaching his Step Five determination, the ALJ may rely on the testimony of a vocational expert as long as it is in

response to a hypothetical that accurately reflects the claimant's physical and mental limitations. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). In formulating the hypothetical, the ALJ need only incorporate those limitations he accepts as credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

In this case, the ALJ asked the VE a hypothetical that incorporated the following limitations, which were ultimately adopted by the ALJ in his RFC determination: "[the hypothetical individual] retains the residual functional capacity for light work, but is limited to no more than occasional pushing or pulling, or reaching over shoulder level with the left upper extremity." Tr. 58-59. Based on the hypothetical, the VE testified that the hypothetical individual could perform work as a hand packager, electronics worker, and small products assembly. Freeman argues that the ALJ instead should have relied on the VE's testimony in response to the hypothetical question posed by his counsel, which included a limitation on occasional handling and fingering based on the limitation set forth by Dr. Thomas. This argument merely restates Freeman's earlier argument, which was considered and rejected above, that the ALJ erred by failing adopt all of Dr. Thomas' restrictions in his RFC determination. Further, the ALJ was not required to include limitations in the hypothetical that he determined were unsupported by the evidence or not credible. *See Casey*, 987 F.2d at 1235. Therefore, the ALJ did not err, and the VE's testimony -- given in response to a hypothetical that reasonably reflected all the limitations that the ALJ found valid and credible -- constituted substantial evidence supporting the ALJ's Step Five finding. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The ALJ thus reasonably found Freeman not disabled at Step Five.

### VII. Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Kevin H. Freeman's application for DIB should be **AFFIRMED**.

Dated: June 17, 2013

Kathleen B. Burke
United States Magistrate Judge

### **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).